**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

**Civil Action No.: 5:19-CV-0532-D**

| | | |
|---|---|---|
| JOSE RIOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **SECOND AMENDED COMPLAINT** |
| CITY OF RALEIGH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**COMES NOW**, the Plaintiff, by and through the undersigned, complaining of the

Defendant, and alleges and says:

## NATURE OF THE CASE

This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, *et. seq*. The jurisdiction of this Court is invoked to redress the

deprivation of rights guaranteed by federal law. These rights provide for damages for illegal

retaliation and discrimination in the employment of Plaintiff Rios. Plaintiff Rios seeks

damages, including, but not limited to, lost pay, loss of past, present, and future benefits,

compensatory damages, pain, suffering, and mental anguish as a result of the intentional and

unlawful discrimination by Defendant as more fully described below.

1

## PARTIES AND JURISDICTION

1. Jose Rios ("Plaintiff") is, and at all times relevant to this Complaint was, a Hispanic (Puerto-Rican) browned-skin American male citizen and resident of Raleigh, Wake County, North Carolina.

2. Upon information and belief, the City of Raleigh (hereinafter) "Defendant" or "RPD" or "City") is a body corporate capable of suing and being sued under the laws of the State of North Carolina.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as this action presents a federal question.

4. The City of Raleigh is an employer who regularly employs more than fifteen (15) persons.

5. Upon information and belief, Defendant has purchased liability insurance and/or participates in a risk pool that covers the claims alleged herein and the same is sufficient to effectuate a waiver of its sovereign and/or governmental immunity.

## FACTUAL ALLEGATIONS

6. Paragraphs 1-5 are re-alleged and incorporated herein by reference.

7. Plaintiff Jose Rios ("Det. Rios") was originally hired as a Police Officer with the Raleigh Police Department ("RPD") on or around October 2, 2000.

8. Through hard work and diligence, Det. Rios was promoted to the rank of Detective in 2010.

9. In his role as a detective, Det. Rios always performed his job more than satisfactorily. Moreover, from 2010 until July 2016, Det. Rios worked with the Department's South General Investigative Unit ("SGIU").

10. In July 2016, the Investigative Support Unit ("ISU") was created. The ISU was a new unit comprised of three (3) detectives that worked primarily with the Leads Online Software program and specialized in the area of property crimes.

11. The three (3) detectives selected to make up the ISU were: Det. Rios and Detectives Wilbur O'Neal and Scott Womack. O'Neal and Womack are Caucasian males.

12. Det. Rios's schedule while with the ISU was from 9:00 a.m. until 5:00 p.m. Upon information and belief, the 9:00 a.m. to 5:00 p.m. schedule was desirable amongst members of the RPD.

13. Upon information and belief, Detective O'Neal worked primarily with the local pawn shops. Detective Womack worked primarily with organized retail theft and Det. Rios worked primarily metal theft consisting of theft of copper, catalytic converters and scrap metal.

14. Upon information and belief, metal theft investigation was the least desirable in the ISU; however, Det. Rios volunteered for the position.

15. Det. Rios volunteered as he believed that if he volunteered for a position nobody else wanted, he would eventually be in line for a better, more high-profile assignment.

16. Upon information and belief, once word got out about the desirable hours of the ISU, other Detectives were then interested as a result of the favorable hours and the Leads Online Program.

17. Within approximately six(6) months of working with the new ISU squad, Det. Rios was transferred to the Juvenile Investigative Unit ("JIU").

18. Upon information and belief, a more senior Caucasian detective was awarded Det. Rios' former position, which would allow him to work the more favorable day shift hours.

19. Det. Rios did not request a transfer from the ISU.

20. Upon information and belief, the JIU is an undesirable assignment because of the types of crimes investigated, to wit: sex crimes involving juveniles, missing/runaway juveniles, and child abuse cases.

21. The JIU unit consisted of seven (7) detectives and one (1) Sgt. The unit had two (2) African American males, one (1) bi-racial female, three (3) Caucasian males, and one Hispanic male, Det. Rios.

22. Approximately two (2) months into the new assignment, Det. Rios discovered that Detectives Hubbard and Doughty, Caucasian males, were tasked with working only high-profile sex abuse cases while the rest of the unit handled the remaining cases that were missing/runaway teen, sexual abuse, and cases of child abuse reported through Wake County Health and Human Services.

23. On or around February 2017, Robert Latour, Caucasian male, was assigned as the sergeant of the JIU. ("Sgt. Latour")

24. Upon information and belief, Sgt. Latour immediately became friendly with Detectives Hubbard and Doughty. They would often go to breakfast together.

25. Shortly thereafter, Det. Rios overheard a conversation between Hubbard, Doughty and Latour regarding maintaining the "status quo" within the unit, where they would work only the sex abuse investigations.

26. Sgt. Latour held an open meeting with the squad as to how they wanted to handle the cases within the unit.

27. Upon information and belief, Det. Rios was the only person to speak and stated that he thought it would be fair that everyone carried a comparable number of cases and that the work should be distributed evenly amongst the detectives.

4

28. On or around April 28, 2016, one of Det. Rios' cases was scheduled for a multi-disciplinary team ("MTD") meeting. As a result, the detectives, the Child Protective Services ("CPS") worker, and SAFE child ("the team") would confer and make a final decision on abuse cases that they had worked together.

29. During the course of the MDT meeting, Wake County Assistant District Attorney Kathryn Pomeroy brought to the attention of the team that a mistake was made regarding an eight (8) year old victim.

30. Upon information and belief, the eight (8) year old victim was not interviewed and a Child Medical Examination ("CME") was not done. Asst. DA Pomeroy questioned Det. Rios as to why the CME and interview were not done.

31. Det. Rios responded that it was the CPS caseworker's decision not to have a CME done, not his.

32. Upon information and belief, the CPS caseworker, Jennifer Woody, and her supervisor, Kizzy Thomas, became upset when confronted by Asst. DA Pomeroy about the failure to schedule a CME.

33. Upon information and belief, Asst. DA Pomeroy was not accusatory of CPS, but conversely, simply advised them to be sure to have a CME done the next time.

34. Later that day, Det. Rios was approached by another detective that had been told by a CMS worker to let Det. Rios know he should "watch [his] back" and that someone at CPS was looking to "screw [him] over".

35. With that information, Det. Rios approached Sgt. Latour to ask him if anyone from CPS had contacted him. Sgt. Latour responded by informing Det. Rios that Kizzy Thomas was upset at how he handled the investigation.

5

36. Det. Rios explained to Sgt. Latour what had occurred at the MDT. Latour advised Det. Rios not to worry about it.

37. Det. Rios advised Sgt. Latour that he would take out the warrants the following week and prior thereto, attempt contact with the suspects to try and get them to come in and give a statement. Nothing more was said regarding the MDT and/or CPS.

38. Det. Rios returned to work on Monday, May 1, 2017 and attempted to contact the two (2) listed suspects in the current investigation. Det. Rios' plan was to attempt to get a confession prior to swearing out the warrants.

39. Det. Rios could not make contact with them and as a result, the warrants were not sworn. He sent a text to Jennifer Woody advising her of the same and did not get a response. The next day, Det. Rios attempted contact again. He was not successful. He did not have the warrants and sent a text to Ms. Woody advising her of the same. She did not respond, again.

40. Det. Rios also advised Sgt. Latour as he was scheduled to be off on Wednesday, May 3, 2017. He advised Sgt. Latour that he would have the warrants sworn on the morning of May 4, 2017.

41. On May 4, 2017, while Det. Rios was on his way to the magistrate's office to swear out the warrants, Sgt. Latour texted him asking if the warrants had been taken out. Det. Rios advised he was on his way.

42. On May 8, 2017, Sgt. Latour asked Det. Rios about the warrants he had issued. Sgt. Latour informed Det. Rios that the warrants he had issued, according to Jennifer Woody, were incorrect.

43. Sgt. Latour also admitted that he had been in communication with Ms. Woody the entire week. Det. Rios asked Sgt. Latour why Ms. Woody did not contact him. Sgt. Latour replied, "I don't know."

44. A few weeks later, Det. Rios was summoned to the office of Lieutenant Eric Desimone ("Lt. Desimone"), Caucasian male. Upon information and belief, Lt. Desimone served as the Lieutenant over the Youth and Family Services Unit, the JIU, and the School Resource Officers Unit.

45. Lt. Desimone advised Det. Rios that a complaint had been filed against him by Jennifer Woody and Kizzy Thomas, citing "poor police service".

46. Upon information and belief, and according to RPD policy, a typical investigation of a complaint would be commenced by interview of the officer's immediate supervisor. During this time, Det. Rios' immediate supervisor was Sgt. Latour.

47. Lt. Desimone read Det. Rios his Garrity rights and advised that the complaint was about Det. Rios' not filing the warrants on time.

48. Lt. Desimone asked a series of questions regarding the investigation and Det. Rios gave his statement. Det. Rios also advised Lt. Desimone that the complaint against him was done with malicious intent as Ms. Woody did not like being called out for a mistake she made by the Asst. District Attorney.

49. A few more weeks passed after Det. Rios gave his statement. He had heard nothing about the outcome of the investigation. He then approached Lt. Desimone and asked him if any discipline would be imposed based upon the complaint. Lt. Desimone replied, "no".

50. Lt. Desimone further advised that as far as he was concerned, the investigation was over.

7

51. On or around June 2017, Det. Rios was contacted by Sgt. Bridget Stranahan, Caucasian female, of the RPD's Internal Affairs Unit. Sgt. Stranahan advised Det. Rios that she need to speak with him regarding the same case he had spoken to Lt. Desimone about.

52. Det. Rios was asked to bring the complete case jacket for the investigative file he had spoken to Lt. Desimone about.

53. Subsequent to reading him his Garrity rights, Sgt. Stranahan did not question Det. Rios regarding the complaint filed by Ms. Woody.

54. Sgt. Stranahan, in an accusatory manner, questioned Det. Rios about why he had incorrect dates on the final report he submitted in the supplement to the investigation.

55. Sgt. Stranahan averred that Det. Rios was being "deceitful" with Sgt. Latour.

56. Det. Rios advised that he made an honest mistake regarding the dates he swore out the warrants. Instead of putting May 4, 2017, the date the warrants were actually sworn out, he mistakenly put May 2, 2017.

57. Det. Rios further advised Sgt. Stranahan that the correct date was on the warrants and that he had put in a call for service requesting an officer respond to the suspects' address in an attempt to serve the warrants.

58. Det. Rios gave Sgt. Stanahan his full statement regarding the false accusations against him.

59. Upon information and belief, coupled with Det. Rios' general experience in the RPD, if an officer was cleared of an Internal Affairs investigation, then, that officer would be targeted again as Internal Affairs would find something else to accuse the officer of.

60. A few weeks later, without any indication as to where the investigation was at that point, Det. Rios was called back to Internal Affairs to speak with Sgt. Stranahan, again.

8

61. This time, Sgt. Stranahan did not question Det. Rios about the complaint by Ms. Woody nor was he questioned about putting incorrect dates in his supplement.

62. Sgt. Stranahan proceeded to question Det. Rios about five (5) CPS reports that were turned in late to Sgt. Latour.

63. Det. Rios, at that time, had come to believe that he was being targeted by either Sgt. Latour and/or the Internal Affairs Unit as the questioning had nothing to do with the original complaint nor the incorrect dates in his supplement.

64. Prior to being questioned by Sgt. Latour, Det. Rios told her he knew exactly which case reports she was asking about. Det. Rios further informed Sgt. Stranahan that the Juvenile Detectives were now required to type up their own CPS reports.

65. Prior to the new rule, the CPS reports were typed up by the desk officer for investigations. He advised that they were without a desk officer at that time.

66. Det. Rios further advised Sgt. Stranahan that he was not familiar with how KOPS Mobile operated and that he was having difficulty with the program used to create the CPS reports.

67. Det. Rios further advised that he was not sure whether the KOPS system was working properly and that he had waited until he had more time to familiarize himself with using the system.

68. Det. Rios discovered that the KOPS software was not working properly. On May10, 2017, Det. Rios completed all five (5) of the reports and turned them in to his supervisor, Sgt. Latour on that same date.

69. On or about a week after turning in his reports, Sgt. Latour approached Det. Rios in the hallway and asked why he turned in all five (5) reports late. Det. Rios apologized for the

9

reports being late and advised Sgt. Latour that IT must have fixed the issues he was having with KOPS and that he completed them all at once as he had the time to do so.

70. No further communication with Sgt. Latour was had regarding the reports being turned in late.

71. Sgt. Stranahan intimated that Sgt. Latour told her that Det. Rios told him that Rios had actually spoken with some in the IT department.

72. At the end of the interview and after recording was stopped, Det. Rios asked Sgt. Stranahan why the late reports come up in the investigation, when it had nothing to do with the complaint filed by Woody. Sgt. Stranahan did not respond.

73. On Wednesday, August 2, 2017, while on vacation with his family in Florida, Det. Rios received a phone call from Lt. Desimone. Lt. Desimone informed Det. Rios that they were looking for the case jacket for the Internal Affairs complaint so they could "wrap up the investigation."

74. Det. Rios originally thought the jacket was in his file cabinet. He recalled a few minutes late the jacket was in the District Attorney's office and called and advised Lt. Desimone of the same.

75. On August 7, 2017, Det. Rios was scheduled to return to work at 1500 hours. Prior to leaving his house, he received a phone call from Sgt. J.E. Neville, Caucasian male, of the Internal Affairs Unit. Sgt. Neville asked if Det. Rios could respond to his office prior to going to work.

76. Det. Rios went immediately to Sgt. Neville's office. Upon arrival, Captain Todd Jordan, Caucasian male, was present as well. Sgt. Neville advised Det. Rios that he was being placed on administrative duty until further notice.

10

77. Det. Rios asked Sgt. Neville why he was being placed on administrative duty and Sgt. Neville responded that he did not know why but he was told to do so by Major Karen Riggsbee, Caucasian female.

78. Det. Rios' duty weapon, vehicle keys, department issued cell mobile phone and identification card were turned over to Sgt. Neville. He was further advised to go to the work vehicle and remove all personal items.

79. Det. Rios was advised that he was to report to the Call Response Center for further instructions and that would be his assignment until further notice.

80. On or around September 6, 2017, Det. Rios was called into Sgt. Stranahan's office at Internal Affairs again. Sgt. Stranaham advised Det. Rios that there was a new complaint filed against him by the RPD.

81. The complaint stated that Det. Rios did not follow policy regarding "found property" and evidence. Sgt. Stranahan informed Det. Rios that a license plate and four (4) cell phones were found inside of his work desk.

82. Det. Rios was not advised that his desk would be searched nor that given an opportunity to collect his personal belongings. Det. Rios was not allowed entry into the building without permission.

83. Sgt. Stranaham asked Det. Rios about the license plate. Det. Rios responded that the case was so old that he had forgotten where the plate had come from. The case was from 2013. Det. Rios advised that he had moved work-stations five (5) times and he would only come across the plate while packing.

84. Det. Rios admitted to violating policy about the license plate.

11

85. Det. Rios advised that two (2) of the mobile phones were department issued and that every time he upgraded, he was told by IT personnel to hold on to the old phone. He did. The other two (2) phones belonged to his son.

86. Det. Rios had taken the phone from his son who had claimed that he got it from a friend. Det. Rios brought it to work to ensure that it was not stolen. It was not. Det. Rios never gave his son the phone back. His son was in the 7th grade at the time the phone was taken. At the time Det. Rios was questioned about the phone, his son was in the 12th grade.

87. The last phone was a phone that Det. Rios had purchased for his son. His son no longer used the phone as he had purchased his own phone. Det. Rios kept that phone at his desk in case he lost or broke his phone.

88. Upon information and belief, all of the phones found in Det. Rios' desk were searched.

89. Upon information and belief, without knowing the ownership of the phones, the RPD searched all.

90. Det. Rios questioned Sgt. Stranahan about how the "found property" investigation would affect the current investigation and his status. Sgt. Stranahan informed Det. Rios that the last investigation involving the CPS matter was finished "months ago". She further advised that it was up to the Deputy Chief to make a final decision.

91. Upon information and belief, there is no departmental policy that covers the search of personal belongings, even if on department property.

92. As a result of the investigations noted hereinabove, Det. Rios suspected he was being targeted for severe punishment and/or termination from the Department.

93. Upon information and belief, Detective Rios' Internal Affairs communications with Sgt. Stranahan should have been transcribed and provided to Det. Rios per RPD policy. Det. Rios was not provided the transcript of his communication with Sgt. Stranahan.

94. At this point, after being placed on administrative leave by Major Rigsbee and having a new investigation commenced, Det. Rios suspected he was being targeted based upon his race (Hispanic) and his skin color (Brown).

95. Upon information and belief, the "investigation" into Detective Rios began on or around May 2017, subsequent to a complaint filed by Woody.

96. Detective Rios was never interviewed by Sgt. Latour nor informed that he was under investigation about the child abuse case. Upon information and belief, per RPD policy, Det. Rios should have been interviewed and informed by Sgt. Latour.

97. Detective Rios answered all questions posed to him by Sgt. Latour, despite not knowing an official investigation had begun, and led to believe that he did not have anything to worry about and/or that it was not a big deal as the original complaint was external.

98. Upon information and belief, IA began investigation based upon complaints by CPS and the DA's office subsequent to the investigative mistakes made by CPS during a child abuse investigation.

99. Upon information and belief, it is the policy of the RPD's IA unit to conclude an administrative investigation within thirty (30) days of its commencement with notice given to the officer the subject-matter of the investigation.

100. Upon information and belief, subsequent to being placed on "administrative duty" on August 7, 2017, Detective Rios received Major Riggsbee's findings and recommendations on November 20, 2017, recommending a written reprimand.

## RIOS' HISTORIC BACKGROUND WITH DECISIONMAKER'S HUSBAND

101. Upon information and belief, Major Riggsbee has been personally aware of Detective Rios' interpersonal issues with her husband, Sgt. Floyd Riggsbee.

102. Major Karen Riggsbee is married to now retired former Sgt. Floyd Riggsbee. Det. Rios, in 2007 and 2008 worked in Field Operations in the Southwest District on Squad "C". Sgt. Floyd Riggsbee was his supervisor during that time.

103. Det. Rios and Sgt. Floyd Riggsbee had numerous incidents all surrounding Floyd Riggsbee's harassment and bullying of the minority members of the squad. At that time, Det. Rios was the most senior member of the squad. Det. Rios had requested several transfers, all of which were denied.

104. On one such occasion, towards the end of Det. Rios' tenure with Field Operations, he and Sgt. Floyd Riggsbee were almost involved in a physical altercation.

105. Sgt. Floyd Riggsbee, on a Monday morning, was intending to write up Det. Rios for an alleged incident that occurred on Friday evening. Det. Rios advised that he was not signing any counseling form without going to Internal Affairs first.

106. Sgt. Floyd Riggsbee then began loudly and angrily yelling at Det. Rios, citing that he was being insubordinate. Det. Rios never raised his voice while Sgt. Floyd Riggsbee kept yelling at him.

107. Det. Rios stood up to leave. Sgt. Floyd Riggsbee told him that if he left, he would have him fired. Det. Rios left anyway to avoid further confrontation. As he was walking out, Det. Rios noticed Sgt. W.N. Vaughn, Caucasian male, then sergeant of the "B" squad, and J.C. Perry, Caucasian male, then District Lieutenant. Both made eye contact with Det. Rios but did not say a word to him.

14

108.    Defendant RPD did not provide any reason for Plaintiff being placed on Administrative Leave at that time.

109.    Upon information and belief, administrative leave is typically reserved for officers that have violated the law, not administrative matters.

110.    Subsequent to the recorded conversation with Internal Affairs, Plaintiff inquired again as to why he was being placed on administrative duty.

111.    Sgt. Neville replied, he did not know and that he had been ordered to do so by the "Major". Upon information and belief, the major Neville referred to was Major Karen Riggsbee.

112.    Upon information and belief, there is no documentation in the investigation that Sgt. Latour ever counseled or warned Det. Rios of any accusations against him that were in violation of department policy prior to Det. Rios being placed on administrative duty.

113.    In 2007-2008, Det. Rios had made several complaints about harassment being perpetrated upon him by then Sgt. Floyd Riggsbee, his supervisor at the time.

114.    Upon information and belief, J.C. Perry, who witnessed at least one incident involving Sgt. Floyd Riggsbee, was Deputy Chief at the time of Det. Rios' termination.

115.    On or around January 31, 2018, after several months on administrative leave and constantly under investigation, Det. Rios filed his Charge of Discrimination with the EEOC. Attached hereto as Exhibit "A".

116.    Detective Rios alleged, *inter alia*, that he was being discriminated against by the RPD, and more particularly, Major Karen Riggsbee, where the origins of the discriminatory animus against him began with her husband, Sgt. Floyd Riggsbee.

15

117.   Upon information and belief, after the RPD was informed that Detective Rios had filed an EEOC Charge of Discrimination in late January and/or early February 2018, the RPD intentionally retaliated against Detective Rios by questioning him about an alleged December 2016 incident.

118.   During the course of all of the IA "investigations", Detective Rios willingly answered any and all questions posed to him , truthfully, and based upon his recollection of the events.

119.   Upon information and belief, several, if not all detectives, "date" supplements with the date of the original act and it is not an uncommon occurrence nor considered "backdating' a document as Detective Rios was accused.

120.   Upon information and belief, several Caucasian police officers that have actually committed violations of RPD policies, more egregious in nature than any of the "allegations" lodged against Detective Rios, have either not been disciplined at all and/or have received far less severe sanctions as compared with Detective Rios.

121.   Upon information and belief, and in direct comparison to the treatment suffered by Detective Rios, Caucasian officers have been accused of "insubordination" and have not been disciplined at all.

122.   Upon information and belief, Douglas Bacon, Caucasian male, was publicly insubordinate with his supervisor and used profanity in an argument with his supervisor.

123.   Upon information and belief, Bacon was simply transferred to another unit, not terminated for his insubordination.

124.   Upon information and belief, another Caucasian officer was arrested for being impaired at the RDU Airport and illegally attempting to carry a weapon onto his flight.

125.    Upon information and belief, that officer was the son of a retired Police Chief and allowed to retire early with his full benefits to date.

126.    Upon information and belief, this course of action by the RPD allowed the officer to obtain a law enforcement position elsewhere.

127.    Upon information and belief, a Caucasian male police officer was involved in a sex scandal with a female trainee in the academy.  This officer was married at the time of the sex scandal and not terminated as was Det. Rios.

128.    Upon information and belief, this officer was demoted as opposed to being terminated. Upon further information and belief, this officer is now a Captain.

129.    Upon information and belief, two Caucasian officers were involved in a physical altercation with one another, at a pubic location.

130.    Upon information and belief, one officer was allegedly having an affair with the wife of the other and the altercation witnessed by several RPD officers.

131.    Upon information and belief, during the altercation, a weapon was drawn by one of the officers.

132.    Upon information and belief, neither officer was terminated nor charged for engaging in an altercation, in public, while drawing a weapon.

133.    Alternatively, to the extent the alleged insubordination, consisting of Detective Rios' alleged refusal to cooperate in yet another "investigation", is considered a terminable violation of RPD "policy, then, the same "participation" would have been simply an exercise in futility.

17

134.    Upon information and belief, after filing the EEOC complaint of discrimination, and after several requests for the "status" of the investigations of RPD, Det. Rios is terminated for alleged insubordination for allegedly refusing to participate in an investigation.

135.    The alleged "investigation" involved a missing case file.  Det. Rios responded via email to Sgt. Latour that the case file was in the District Attorney's Office.

136.    Defendant City terminated Det. Rios' employment on or around March 2018 as a result of and subsequent to learning Det. Rios had filed a Charge of Discrimination with the EEOC.

137.    On or around March 26, 2018, Det. Rios filed another Charge of Discrimination  for Retaliation  subsequent to his termination.  See attached Exhibit "B".

138.    That Detective Rios's termination was in direct retaliation for engaging in "protected activity".

139.    That the EEOC issued its Right-to-Sue Letter on July 11, 2018.  See attached Exhibit "C".

## COUNT I
### (Violation of Title VII of the Civil Rights Act of 1964)
### (National Origin Discrimination and Retaliation)

140.    The allegations of Paragraphs 1-139 of this Complaint are re-alleged and incorporated by reference.

141.    By engaging in the discriminatory acts, practices and conduct described above, the Defendant has discriminated against Plaintiff in the terms and/or conditions of his employment on the basis of his national origin, all in violation of Title VII of the Civil Rights Act of 1964, as amended.

142.    By engaging in such discriminatory and retaliatory conduct, the Defendant either knew or

18

should have known that their conduct would cause Plaintiff, or any other person of ordinary sensibilities, damage, injury and suffering.

143. Indeed, as regards any person, whether a person of ordinary sensibilities or a hard-working Puerto Rican American, severe emotional distress is a natural and foreseeable consequence of the type of discriminatory conduct practiced by the Defendant.

144. Det. Rios had performed his job more than satisfactorily prior to his removal as a Detective and was, at all times, qualified for his position.

145. Nonetheless, in the instant case, Plaintiff suffered disparate and blatantly discriminatory treatment before being removed from his position as a Detective, all on account of his national origin.

146. Det. Rios, after having spent months on administrative status, constantly inquired about his job and his regular return to duties.

147. Det Rios was subjected to meritless and/or retaliatory "investigations" for months without any resolution, and the result of which continued him on administrative status.

148. As a direct, proximate and foreseeable result of having been the victim of the discriminatory and retaliatory conduct that the Defendant has directed toward Plaintiff, he has been damaged. He will continue to lose, substantial wages, with a resulting loss of future earnings and enjoyment of life due to the demotion from his position as principal. He has also suffered, and is continuing to suffer, severe emotional distress, depression, and mental anguish.

149. As compensation for the above-noted injuries and losses, Plaintiff is entitled to recover compensatory damages from Defendant in an amount greater than Twenty-Five Thousand and No/100ths Dollars ($25,000.00).

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff respectfully prays that:

1.   As to Count I of this Complaint, Plaintiff have and recover of the Defendant compensatory damages in an amount in excess of Twenty-Five Thousand and No/100ths Dollars ($25,000.00).

2. As to all appropriate Counts of this Complaint, Plaintiff have and recover reasonable attorney's fees from the Defendant.

3. As to all appropriate Counts of this Complaint, Plaintiff be awarded pre-judgment and post-judgment interest.

4.   As to all appropriate Counts of this Complaint, Plaintiff have and recover an award of "front pay".

5.   That the costs of this action be taxed against the Defendant.

6.   That this case has a **Trial by Jury** on all issues so triable.

7.   For such other and further relief as to the Court may seem just and proper.

This the 19th day of June 2020.

**HAIRSTON LANE, P.A.**


_**/s/ James E. Hairston, Jr.**_
James E. Hairston, Jr.
NC Bar No.: 19687
434 Fayetteville Street
Suite 2350
Raleigh, North Carolina 27602
(919) 838-5295 Telephone
(888) 510-1160 Facsimile
E-mail: jhairston@hlbnclaw.com

20

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Second Amended Complaint

using the CM/ECF system which will send notification of such filing to:

**CITY OF RALEIGH**
Robin L. Tatum, City Attorney

Alice Tejada
Sr. Associate City Attorney
Email: Alice.Tejada@raleighnc.gov

Dorothy V. Kibler
Deputy City Attorney
Email: Dorothy.Kibler@raleighnc.gov

This the 19th day of June 2020.

> **HAIRSTON LANE, P.A.**
>
> ***/s/ James E. Hairston, Jr.***
> James E. Hairston, Jr.
> N.C. State Bar No.: 19687
> 434 Fayetteville Street, Suite 2350
> Raleigh, North Carolina 27601
> Telephone: 919-838-5295
> Facsimile: 888-510-1160
> jhairston@hairstonlane.com
> *Attorney for the Plaintiff*

22