IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-00532-M

| | | |
|---|---|---|
| JOSE RIOS,<br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>CITY OF RALEIGH and JENNIFER<br>WOODY, in [her] official and individual<br>capacity,<br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **OPINION AND ORDER** |

This matter is before the Court on Defendant City of Raleigh's motion to dismiss [DE-27]
(the "Motion")]. For the reasons stated herein, the Motion is granted in part and denied in part.

I.　　　Procedural Background

Defendant City of Raleigh removed this action from state court on November 22, 2019.
[DE-1.] On June 19, 2020, Plaintiff Jose Rios, with leave of Court, filed a second amended
complaint, leaving only a single claim pursuant to Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e, *et. seq*., against a single defendant, Defendant City of Raleigh.
[DE-26 (the "Complaint" or "SAC").] On July 6, 2020, Defendant City of Raleigh filed a
motion to dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6), for
failure to state a claim upon which relief can be granted. [DE-27.] Plaintiff responded in
opposition on August 17, 2020 [DE-30], and Defendant filed its reply on August 31, 2020 [DE-
31]. The Motion is now fully briefed and is ripe for ruling.

II.　　　Factual Background

Plaintiff Jose Rios brings this action against the City of Raleigh for alleged illegal
retaliation and discrimination that occurred throughout his employment with the Raleigh Police

Department (the "RPD"). [SAC at 1.] The Complaint includes allegations against various individuals during Plaintiff's career at the RPD between 2008 and 2017 and may be summarized as follows:

### A. Discrimination in the Investigative Support Unit

Plaintiff was originally hired by the RPD as a police officer on or around October 2, 2000. [SAC ¶ 7.] By 2010, Plaintiff was promoted to the rank of Detective. [SAC ¶ 8.] Between 2010 and July 2016, Plaintiff worked with the RPD's South General Investigative Unit. [SAC ¶ 9.] In July 2016, the Investigative Support Unit (the "ISU') was created, and Plaintiff was selected as one of three detectives assigned to it. [SAC ¶¶ 10-11.] The ISU had favorable daytime work hours, and "once word got out about the desirable hours of the ISU, other Detectives were then interested." [SAC ¶¶ 12, 16.] Within six months of working in the ISU, Plaintiff was transferred to the Juvenile Investigative Unit (the "JIU") and replaced by a more senior Caucasian detective in the ISU. [SAC ¶¶ 17-19.]

### B. Discrimination in the Juvenile Investigative Unit

In comparison with the ISU, the JIU was an undesirable assignment because of the types of crimes it investigated, including sex crimes involving juveniles and child abuse cases. [SAC ¶ 20.] The JIU consisted of seven detectives and one sergeant. [SAC ¶ 21.] The sergeant, Robert Latour, was a Causation male and was assigned to the JIU on or around February 2017. [SAC ¶ 23.] Plaintiff discovered that two Caucasian male detectives—Detectives Hubbard and Doughty—were tasked with the high profile sex abuse cases, while the rest of the unit—composed of two African American males, one bi-racial female, one other Caucasian male, and Plaintiff—was assigned the lesser cases. [SAC ¶ 21-23.] Plaintiff discovered that Sgt. Latour and Detectives Hubbard and Doughty would often go to breakfast together. [SAC ¶ 24.] Shortly

2

after Sgt. Latour's assignment, Plaintiff overheard a conversation between Sgt. Latour, Detective Hubbard and Detective Doughty "regarding maintaining the 'status quo' within the unit, where they would work only the sex abuse investigations." [SAC ¶ 25.] Sgt. Latour held a JIU meeting to discuss how cases should be handled and only Plaintiff spoke up, stating "that he thought it would be fair that everyone carried a comparable number of cases and that the work should be distributed evenly amongst the detectives." [SAC ¶ 27.]

### C. Child Protective Services Targets Plaintiff

While Plaintiff was at the JIU, on or around April 28, 2017, an Assistant District Attorney ("ADA") informed Plaintiff that a mistake was made in one of his cases: the eight-year-old victim was not interviewed and a Child Medical Examination ("CME") was not done. [SAC ¶¶ 28-30.] Plaintiff responded that it was the Child Protective Services ("CPS") caseworker's decision not to have a CME done, not his. [SAC ¶ 31.] When the ADA spoke to the CPS caseworker, Jennifer Woody, and her supervisor, Kizzy Thomas, they became upset. [SAC ¶¶ 32-33] Later that day, Plaintiff was told by another detective that he "should 'watch [his] back' and that someone at CPS was looking to 'screw [him] over.'" [SAC ¶ 34.]

Sgt. Latour told Plaintiff that the CPS supervisor was upset by how Plaintiff handled the eight-year-old victim's case, and Plaintiff reassured Sgt. Latour that he would attempt to contact the suspects involved in the case and take out warrants the following week. [SAC ¶¶ 35-37.] On May 1 and 2, 2017, Plaintiff attempted to contact the two listed suspects in the investigation—his plan was to get voluntary confessions prior to swearing out the warrants—but could not get in contact with either suspect. [SAC ¶¶ 38-39.] Plaintiff twice informed the CPS caseworker of this development, but she did not respond. [SAC ¶ 39.] Plaintiff informed Sgt. Latour that he was scheduled to be off on May 3, 2017, and that he would have the warrants sworn on May 4,

2017.  [SAC ¶ 40.]  Sgt. Latour contacted Plaintiff on May 4, 2017, asking if the warrants had been taken out, and Plaintiff responded that he was on his way.  [SAC ¶ 41.]  On May 8, 2017, Sgt. Latour informed Plaintiff that, according to the CPS caseworker, the warrants were incorrect.  [SAC ¶ 42.]

### D.  Start of the Investigation into Plaintiff's Conduct

A few weeks later, Plaintiff was summoned to the office of Lieutenant Eric Desimone, Caucasian male.  [SAC ¶ 44.]  Lt. Desimone informed Plaintiff that a complaint, citing "poor police service," had been filed against him by the CPS caseworker and her supervisor.  [SAC ¶ 45.]  Lt. Desimone read Plaintiff his *Garrity* rights and Plaintiff gave a statement.  [SAC ¶¶ 47-48.]  Plaintiff told "Lt. Desimone that the complaint against him was done with malicious intent as Ms. Woody did not like being called out for a mistake she made by the Asst. District Attorney."  [SAC ¶ 49.]  According to RPD policy, a typical investigation of a complaint would be commenced by interview with the officer's immediate superior, here, Sgt. Latour, which Plaintiff alleges did not occur here.  [SAC ¶ 46.]  Moreover, Plaintiff alleges that he was not "informed that he was under investigation about the child abuse case," in violation of RPD policy.  [SAC ¶ 96.]  A few weeks after Plaintiff gave his statement, he contacted Lt. Desimone, who told him that no discipline would be imposed based on the complaint and that, as far as he was concerned, the investigation was over.  [SAC ¶¶ 49-50.]

### E.  Continued Investigation and Placement on Administrative Duty

On or around June 2017, an Internal Affairs ("IA") sergeant, Sgt. Bridget Stranahan, a Caucasian female, further questioned Plaintiff about the case involving the eight-year-old victim.  [SAC ¶ 51.]  She asked why "he had incorrect dates on the final report he submitted in the supplement to the investigation"; more specifically, while Plaintiff's report noted that he swore

4

the warrants out on May 2, 2017, they were not actually sworn out until May 4, 2017. [SAC ¶¶ 51-56.] Plaintiff responded that the incorrect date he wrote was "an honest mistake" and that "the correct date was on the warrants." [SAC ¶¶ 56-57.] Plaintiff alleges that "if an officer was cleared of an Internal Affairs investigation, then, that officer would be targeted again as Internal Affairs would find something else to accuse the officer of." [SAC ¶ 59.]

A few weeks later, Plaintiff was again directed to speak with IA officer Sgt. Stranahan, who questioned him about five different CPS reports that Plaintiff turned in late to Sgt. Latour in May 2017. [SAC ¶¶ 60-62, 68.] Plaintiff responded that the JIU was understaffed at the time, that he had been unfamiliar and had difficulty operating the software used to create the reports, and that the software was not working properly, which Plaintiff had reported to the technology department. [SAC ¶¶ 65-71.] At this time, Plaintiff came to "believe that he was being targeted by either Sgt. Latour and/or the Internal Affairs Unit as the questioning had nothing to do with the original complaint nor the incorrect dates in his supplement." [SAC ¶ 63.]

On Wednesday, August 2, 2017, while on vacation, Plaintiff received a phone call from Lt. Desimone who told Plaintiff "that they were looking for the case jacket for the Internal Affairs complaint so they could 'wrap up the investigation.'" [SAC ¶ 73.] Plaintiff thought the jacket was in his file cabinet, but, a few minutes later, recalled that it was in the District Attorney's office and called Lt. Desimone to inform him of the same. [SAC ¶ 74.]

On August 7, 2017, Plaintiff was scheduled to return to work. [SAC ¶ 75.] That morning, he received a call from Sergeant J.E. Neville, a Caucasian male in IA, who asked Plaintiff to come to his office before going into work. [SAC ¶ 75.] Plaintiff arrived, and Captain Todd Jordan, a Caucasian male, was also present. [SAC ¶ 76.] Sgt. Neville informed Plaintiff that he was being placed on administrative duty. [SAC ¶ 76.] Plaintiff asked him why, and "Sgt.

5

Neville responded that he did not know why but he was told to do so by Major Karen Riggsbee, Caucasian female." [SAC ¶ 77.] Plaintiff turned over his duty weapon, vehicle keys and department-issued cell phone and identification and was told to report to the Call Response Center. [SAC ¶¶ 78-79.]

### F. "Found Property" Investigation

On September 6, 2017, Plaintiff was again called to speak with Sgt. Stranahan of Internal Affairs, and Plaintiff was advised that a new complaint had been filed against him by the RPD. [SAC ¶ 80.] The complaint stated that Plaintiff did not follow policy regarding "found property" and evidence. [SAC ¶ 81.] Sgt. Stranahan informed Plaintiff that a license plate and four cell phones were found inside of his work desk. [SAC ¶ 81.] Plaintiff admitted to violating the policy in connection with the license plate but told Sgt. Stranahan that two of the phones were department-issued and two belonged to his son. [SAC ¶¶ 83-87.] Plaintiff alleges that the RPD searched the phones and that "there is no departmental policy that covers the search of personal belongings, even if on department property." [SAC ¶¶ 88-89, 91.] Plaintiff asked how this found property investigation would affect the current investigation and his status, and Sgt. Stranahan responded that the investigation involving the CPS matter was finished "months ago." [SAC ¶ 90.] Plaintiff alleges that his communications with Sgt. Stranahan should have been transcribed and provided to him according to RPD policy, but were not. [SAC ¶ 93.] It is IA policy to conclude an administrative investigation within thirty (30) days of its commencement. [SAC ¶ 99.]

### G. Major Karen Riggsbee and Sgt. Floyd Riggsbee

Major Karen Riggsbee, who is referenced above as the IA officer ultimately responsible for Plaintiff's placement on administrative leave [SAC ¶ 77], is married to now-retired, former

6

RPD sergeant, Floyd Riggsbee [SAC ¶ 102]. Approximately a decade before the investigation in 2017, between 2007 and 2008, Sgt. Floyd Riggsbee was Plaintiff's supervisor "in Field Operations in the Southwest District on Squad 'C'." [SAC ¶ 102.] During that time, Plaintiff "and Sgt. Floyd Riggsbee had numerous incidents all surrounding Floyd Riggsbee's harassment and bullying of the minority members of the squad," [SAC ¶ 103] and Plaintiff "made several complaints about harassment being perpetrated upon him by then Sgt. Floyd Riggsbee" [SAC ¶ 113].

"On one such occasion, towards the end of Det. Rios' tenure with Field Operations, he and Sgt. Floyd Riggsbee were almost involved in a physical altercation." [SAC ¶ 104.] Sgt. Floyd Riggsbee was writing up Plaintiff for an alleged incident that occurred the previous workday, and Plaintiff told him he was not signing a counseling form without going to IA first. [SAC ¶ 105.] Sgt. Riggsbee "began loudly and angrily yelling at [Plaintiff], citing that he was being insubordinate" all while Plaintiff "never raised his voice." [SAC ¶ 106.] When Plaintiff stood up to leave, Sgt. Floyd Riggsbee told him that if he left, he would have him fired, and Plaintiff left anyway. [SAC ¶ 107.] As he left, two Caucasian officers, including J.C. Perry, then District Lieutenant, "made eye contact with [Plaintiff] but did not say a word to him." [SAC ¶ 107.]

Plaintiff alleges that, "[u]pon information and belief, Major Riggsbee has been personally aware of [Plaintiff's] interpersonal issues with her husband" [SAC ¶ 101] and that "he was being discriminated against by the RPD, and more particularly, Major Karen Riggsbee, where the origins of the discriminatory animus against him began with her husband, Sgt. Floyd Riggsbee" [SAC ¶ 116]. Plaintiff further alleges that "J.C. Perry, who witnessed at least one incident

7

involving Sgt. Floyd Riggsbee, was Deputy Chief at the time of [Plaintiff's] termination." [SAC ¶ 114.]

### H. Others have Received Lesser Sanctions

Plaintiff further alleges that "several Caucasian police officers that have actually committed violations of RPD policies, more egregious in nature than any of the 'allegations' lodged against [Plaintiff], have either not been disciplined at all and/or have received far less severe sanctions as compared with [Plaintiff]," who was placed on administrative leave. [SAC ¶ 120.] Plaintiff lists four examples of what he considers more egregious conduct and less serious punishment involving Caucasian officers. [SAC ¶¶ 121-132.] Plaintiff alleges the following: one police officer used profanity in an argument with his supervisor and was insubordinate and was transferred [SAC ¶¶ 121-123]; another police officer was arrested for being impaired at an airport and for illegally attempting to carry a weapon onto his flight, and he was allowed to retire early with full benefits to date [SAC ¶¶ 124-126]; another officer was involved in an extramarital sexual relationship with a female trainee, and he was demoted but not terminated [SAC ¶¶ 127-128]; and two other officers were involved in a public, physical altercation where a weapon was drawn and neither was terminated [SAC ¶¶ 129-132].

### I. EEOC Charges and Termination

On or around January 31, 2018, after several months on administrative leave and under further investigation, Plaintiff filed his first Charge of Discrimination with the EEOC. [SAC ¶ 115; DE-26-1 ("EEOC Charge A").] In EEOC Charge A, Plaintiff alleges, "*inter alia*, that he was being discriminated against by the RPD, and more particularly, Major Karen Riggsbee, where the origins of the discriminatory animus against him began with her husband, Sgt. Floyd Riggsbee." [SAC ¶ 116.]

8

After the RPD was informed that Plaintiff had filed the first charge of discrimination,

Plaintiff alleges that the RPD intentionally retaliated against Plaintiff by questioning him about

an alleged December 2016 incident involving a missing case file [SAC ¶¶ 117, 135], placing him

on suspension on February 23, 2018 [DE-26-2 ("EEOC Charge B")], and finally terminating him

in March 2018 [SAC ¶ 136]. On March 26, 2018, after Plaintiff's notice of termination, he filed

a second EEOC charge, alleging that he was retaliated against for filing his first EEOC charge.

[SAC ¶¶ 137-138; EEOC Charge B.]

      1.   January 31, 2018, Charge of Discrimination (EEOC Charge A)

Plaintiff filed his first EEOC charge on January 31, 2018. In that charge, Plaintiff

checked the boxes for "National Origin" and "Retaliation" and listed August 7, 2017, a single

date—the date of Plaintiff's placement on administrative duty—under the section titled "Date(s)

Discrimination Took Place." [EEOC Charge A.] The text of the charge is as follows:

> I was hired by the City of Raleigh Police Department on October 2, 2000. I am currently employed in the position of Police Detective. In 2007-2008 I worked in the Field Operations in the Southwest District on C squad. Sgt. Floyd Riggsbee, was my Supervisor before he retired. Sgt. Riggsbee is married to Major, Karen Rigsbee [sic], who is now my Major in Internal Affairs. When Sgt. Riggsbee was my supervisor he subjected me to harassment, and attempted to have me fired. I made several complaints [sic] Lt. J.C. Perry. Because of this incident, I was asked to transfer. On August 7, 2017, Sgt. J.E. Neville, Internal Affairs Unit, requested that I come to his office. Sgt. Neville told me that I was being placed on administrative duty until further notice. I ask [sic] why? Sgt. Neville told me he did not know, he was instructed by Major Riggsbee. Sgt. Neville told me to report to the Call Response Center for further instructions and that was my assignment until further notice. I believe I have been discriminated against because of my national origin, Hispanic, my color, Brown, and retaliated against because I complained about Sgt. Riggsbee in 2007 and 2008, in violation of Title VII of the Civil Rights Act of 1964, as amended.

[EEOC Charge A.]

2. March 26, 2018, Charge of Discrimination (EEOC Charge B)

Plaintiff filed his second EEOC charge on March 26, 2018. Plaintiff checked only the box for "Retaliation" and noted that the "Date(s) Discrimination Took Place" was between February 23, 2018, the date Plaintiff was suspended with pay, and March 22, 2018, the date he received notice of his termination. The text of the charge is as follows:

> I. On February 23, 2018, I was suspended with pay. On March 22, 2018, I learned that as of April 7, 2018, my employment as a Police Detective will end. I was hired by Respondent on October 2, 2000. Respondent employs more than fifteen (15) persons. II. After being placed on administrative duty in August 2017, on February 23, 2018, I was transitioned to suspension with leave. On March 20, 2018, I had a pre-determination hearing, and per a memorandum authored by Major Karen Riggsbee dated March 22, 2018, my termination was to be effective April 7, 2018. Major Riggsbbe [sic] wrote in relevant part, it was determined that you were insubordinate when you violated the following policies: Internal Affairs Investigations Compliance with Laws, Regulations and Orders) [sic]. III. I believe that I have been retaliated against for filing EEOC Charge 433-2018-01162 in violation of Title VII of the Civil Rights Act of 1964, as amended.

[EEOC Charge B.]

III.    Exhaustion

The Court must first determine the extent to which Plaintiff has exhausted his administrative remedies and in turn, the claims properly before the Court. "The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962–63 (4th Cir. 1996) (citing *King v. Seaboard Coast Line R.R.*, 538 F.2d 581, 583 (4th Cir. 1976)).

Before bringing a Title VII suit in federal court, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC. *See Cone-Swartz v.*

*Press Ganey Assocs., Inc.*, No. 4:13-CV-258-D, 2014 WL 5361343, at *1 (E.D.N.C. Oct. 21, 2014); *see also Sydnor v. Fairfax Cty., Va.*, 681 F.3d 591, 593 (4th Cir. 2012) ("Rather than 'a formality to be rushed through,' this exhaustion requirement is 'an integral part of the Title VII enforcement scheme.'" (citing *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005)). The filing of a charge puts the employer on notice of the alleged violations, giving it a chance to address the alleged discrimination prior to litigation, and any claims that are not administratively exhausted may not be subsequently brought in a judicial complaint. *See Sydnor*, 681 F.3d at 593-94. "The goals of providing notice and an opportunity for an agency response would be undermined [] if a plaintiff could raise claims in litigation that did not appear in his EEOC charge. To prevent such gamesmanship, we have held that the scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents. Thus, a plaintiff fails to exhaust his administrative remedies . . . where his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Id.* at 593 (internal quotation marks and citations omitted). "[S]o long as 'a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation,' she 'may advance such claims in her subsequent civil suit.'" *Id.* at 594 (citing *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 237 (4th Cir. 2000)). On the other hand, "when claims in [a] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (citing *Chacko*, 429 F.3d at 508-10). The Court's interpretation of the EEOC charges and the claims that are reasonably related to them determines the proper scope of Plaintiff's judicial complaint.

11

Defendant contends the EEOC charges should be read narrowly, restricting the scope of this action; Plaintiff, in contrast, contends that they should be interpreted broadly, expanding the scope of this action. More specifically, Defendant contends that "Plaintiff's claims are limited entirely to his interaction with IAU Major Karen Riggsbee." [DE-28 at 11.] Defendant argues: first, that EEOC Charge A alleges only that Plaintiff was discriminated against on a single date, August 7, 2017, by Major Riggsbee, who placed Plaintiff on administrative duty in retaliation for Plaintiff's 2007-2008 complaints about her husband; and second, that EEOC Charge B alleges that Plaintiff was suspended and discharged for filing EEOC Charge A. [DE-28 at 11.]

Plaintiff appears to agree with Defendant that EEOC Charge B alleges that Plaintiff was suspended and terminated by Defendant for filing EEOC Charge A [DE-30 at 23], but disagrees with Defendant's interpretation of EEOC Charge A. Instead, Plaintiff argues that EEOC Charge A, in addition to charging retaliation and discrimination by Major Riggsbee, includes claims for discrimination based upon national origin and color against the RPD, generally, concerning Plaintiff's placement on administrative duty and in which "Major Riggsbee and her position of authority over the 'investigations' [w]as *a* factor, not *the* only actor [sic] responsible for this treatment." [DE-30 at 21; DE-30 at 14-16, 19.] Plaintiff also seeks to recover for the alleged discrimination which occurred at the ISU (transfer to JIU) and at the JIU (unequal work assignments). [*See, e.g.*, DE-30 at 16 ("transferred from the more desirable position in the ISU to the JIU, without requesting a transfer.").] Plaintiff further asks the Court to consider the EEOC Intake Questionnaire [DE-17-3] and Inquiry Response [DE-17-4], which Plaintiff submitted to the EEOC and which include a broader set of factual circumstances, to supplement and expand the scope of his EEOC charges. For the reasons that follow, the Court declines to

consider the Intake Questionnaire and the Inquiry Response and adopts neither party's view concerning the proper scope of the Complaint.

A. Intake Questionnaire and Inquiry Response

As an initial matter, the Court will not consider the Intake Questionnaire or Inquiry Response.

Defendant cites *Balas v. Huntington Ingalls Indus., Inc.*, for the proposition that the Court may not use an intake questionnaire to supplement a plaintiff's formal EEOC charges for purposes of exhaustion. 711 F.3d 401, 408 (4th Cir. 2013); [DE-28 at 1-11.] In *Balas*, the Fourth Circuit held precisely that, finding that "[t]he intake questionnaire . . . submitted to the EEOC cannot be read as part of her formal discrimination charge without contravening the purposes of Title VII" and the "district court properly declined to consider those allegations not included in [plaintiff's] EEOC charge." 711 F.3d at 408-09.

Plaintiff argues that *Balas* is no longer good law. Plaintiff argues that a case *Balas* relied upon, *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297 (4th Cir. 2009), was abrogated by the Supreme Court in in *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843 (2019), that *Balas* is inconsistent with the Supreme Court's decision in *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008), and that a circuit split exists on the issue of whether an intake questionnaire may be considered part of an EEOC charge for exhaustion purposes. [DE-30 at 16-20.]

With respect to *Fort Bend Cty.*, one court recently rejected Plaintiff's first argument:

> The Supreme Court's recent decision in *Fort Bend County, Texas v. Davis*, 139 S. Ct. 1843 (2019) . . . does not change the Court's analysis. In *Fort Bend County*, the Supreme Court abrogated the Fourth Circuit's holding in *Jones v. Calvert Group, Ltd.*, 551 F.3d 297 (4th Cir. 2009) and held that Title VII's administrative procedures were not jurisdictional in nature. *Fort Bend Cty.*, 139 S. Ct. at 1850 ("Title VII's charge-filing requirement is not of jurisdictional cast."). Therefore, the defendant

13

in *Fort Bend County* was not permitted to raise the argument that plaintiff had failed to exhaust administrative remedies for the first time after several years of litigation. *Id.* at 1848. In contrast, Defendant in this case has raised the argument that Plaintiff had failed to exhaust administrative remedies consistently throughout the course of this litigation. (*See* Doc. No. 19, p. 3 (raising the defense in the answer that Plaintiff's claim exceeded the scope of her EEOC charge); Doc. No. 9, p. 4 (raising the same defense in a motion to dismiss)). While Defendant, following what was then Fourth Circuit precedent, previously presented this argument as an issue of jurisdiction, the substance of the argument was still validly invoked—that Plaintiff was limited to the allegations brought in her EEOC charge. *Fort Bend County* did not soften the administrative procedural requirements of Title VII. *See* 139 S. Ct. at 1851 (noting that Title VII's charge-filing requirement was "mandatory" even though it was not "jurisdictional"). For these reasons, the Court finds that Plaintiff's claim of retaliation is limited to the allegations contained in her EEOC charge, and the claim fails as a matter of law because Plaintiff has not shown that she engaged in "protected activity" under Title VII.

*Abadi v. Mecklenburg Cty. Gov't*, No. 3:17-CV-00435-FDW-DCK, 2019 WL 2546732, at *3 (W.D.N.C. June 20, 2019). This Court rejects Plaintiff's argument for the same reasons. *Fort Bend Cty.* held only that Title VII's charge filing requirement is a procedural claim-processing rule, applicable and mandatory if timely raised, rather than a jurisdictional requirement that could be raised at any stage of the proceeding. *Fort Bend Cty.*, 139 S. Ct. at 1846, 49-51. *Fort Bend Cty.* said nothing about *Balas*' holding that a plaintiff cannot substantively expand the scope of his EEOC charges through an intake questionnaire. Here, as in *Abadi*, Defendant raised its exhaustion defense at the earliest possible time, in its motion to dismiss, and so it is properly before this Court, although pursuant to Rule 12(b)(6) rather than as a jurisdictional issue under Rule 12(b)(1). Other courts in the Fourth Circuit, including in this district, have also continued to follow *Balas* after *Fort Bend Cty.* *See Griffis v. Duke Energy Progress*, 5:19-CV-119-FL, 2019 WL 3659992, at *2 (E.D.N.C. Aug. 6, 2019) ("In any subsequent lawsuit, the court 'may only consider those allegations included in the EEOC charge' in order to determine whether

14

plaintiff has exhausted her remedies." (quoting *Balas*, 711 F.3d at 407)); *Major v. Cape Fear Academy,* 7:19-CV-11-D, 2020 WL 3513243, at *6 (E.D.N.C. June 26, 2020) (holding that the plaintiff's failure to mention constructive discharge in EEOC charge "procedurally bars the court from considering this claim" (citing *Balas*, 711 F.3d at 408-09)); *Kenion v. Skanska USA Bldg., Inc.*, No. CV RDB-18-3344, 2019 WL 4393296, at *7-8 (D. Md. Sept. 13, 2019) (citing both *Balas* and *Fort Bend* and declining to "reach beyond the administrative charge and probe the EEOC investigative file, including [the] EEOC Inquiry intake questionnaire"; "This Court may not reach beyond the EEOC Charge to broaden its scope."); *Clement v. Spartanburg Steel Prod., Inc.*, No. CV 7:19-666-MGL-KFM, 2020 WL 702751, at *3 (D.S.C. Feb. 11, 2020) ("The Court, therefore, is unable to entertain any discriminatory failure to promote claims contained only in [plaintiff's] EEOC Inquiry Form." (citing *Balas*, 711 F.3d at 409)).

Plaintiff's contention that *Balas* is inconsistent with *Holowecki* is equally unavailing. *Balas* addressed the issue of administrative exhaustion in the Title VII context, while *Holowecki*, involving an Age Discrimination in Employment Act of 1967 action, "addresses whether an intake questionnaire, accompanied by an affidavit requesting the agency to take action, constitutes a 'charge' *for statute of limitations purposes. Holowecki* does not concern the question of whether an intake questionnaire expands the scope of a formal administrative charge." *Pruitt v. Peninsula Reg'l Med. Ctr.*, No. CIV.A. GLR-14-344, 2014 WL 2916863, at *6 (D. Md. June 25, 2014) (emphasis added); *see also Lindsey v. Ricoh USA, Inc.*, No. 2:17-CV-464, 2018 WL 1937062, at *5 (E.D. Va. Apr. 24, 2018) ("[T]his Court has limited the holding of *Holowecki* to situations where a plaintiff seeks to have an EEOC filing other than the plaintiff's formal charge be considered the 'charge' for purposes of defeating a Title VII time-bar defense. Such is not the case here. Rather, Plaintiff asks the Court to treat her intake questionnaire as part

15

of her formal Charge for exhaustion purposes . . . . But Plaintiff has not identified any case in which *Holowecki* was applied for this purpose. In fact, other federal courts have declined to expand *Holowecki* in this way." (citations omitted)). Courts in this Circuit have applied both *Holowecki*—concerning statute of limitations and timeliness—and *Balas*—concerning administrative exhaustion—distinctly and consistently. *See, e.g.*, *Brown v. Bratton*, No. CV ELH-19-1450, 2020 WL 886142, at *18 (D. Md. Feb. 21, 2020) (addressing exhaustion issue and stating "[l]ooking, as I must, to the four corners of the EEOC Charge" (citing *Balas*, 711 F.3d at 407-08); also addressing statute of limitations issue and stating, relying on *Holowecki*, "[i]n sum, I am satisfied that plaintiff's EEOC Questionnaire is the operative 'charge' for the purpose of Title VII's limitations period" (citations omitted)). This case involves the issue of administrative exhaustion, and the Court is bound by *Balas*.

Finally, Plaintiff notes that a circuit split exists regarding whether an intake questionnaire can supplement a charge for exhaustion purposes. [DE-30 at 17 (citing *Klotzbach-Piper v. Nat'l R.R. Passenger Corp.,* 373 F. Supp. 3d 174, 188-89 (D.D.C. 2019).] Although interesting, this Court is bound by Fourth Circuit precedent. *Balas* requires that only the formal EEOC charges be considered for purposes of administrative exhaustion.

### B. Proper Scope of the Complaint

Having resolved that it cannot consider the Intake Questionnaire and Inquiry Form, the Court must now determine which claims are properly before this Court. As stated above, Plaintiff has exhausted only those claims reasonably related to his EEOC charges and which can be expected to follow from a reasonable administrative investigation into the conduct alleged therein. *See Sydnor*, 681 F.3d at 594 (citation omitted).

16

1. January 31, 2018, Charge of Discrimination (EEOC Charge A)

The text of EEOC Charge A alleges that Plaintiff "ha[s] been discriminated against because of my national origin, Hispanic, my color, Brown, and retaliated against because I complained about Sgt. Riggsbee in 2007 and 2008 . . . ." [EEOC Charge A.] The first portion of that statement, referring to national origin and color discrimination—"discriminated against because of my national origin, Hispanic, my color, Brown"—although broad, is immediately preceded by eleven (11) sentences all concerning Major Riggsbee, Plaintiff's relationship with her husband, Sgt. Floyd Riggsbee, and Plaintiff's placement on administrative duty by Major Riggsbee. The text of the charge focuses on Plaintiff's placement on administrative duty by Major Riggsbee, either as a result of her discrimination on the basis of national origin or color or in retaliation for Plaintiff's complaints about her husband a decade earlier.

However, the scope of exhaustion is not limited to the text of the charge. A reasonable administrative investigation into Plaintiff's placement on administrative duty by Major Riggsbee would also likely reveal other discriminatory conduct involving Plaintiff's placement on administrative duty and concerning the precipitating, related investigations, if such evidence exists. These allegations all involve the same form of discrimination—national origin and color discrimination—all involve the same people—IA officers—all occur within the same time period—between May 2017 and August 7, 2017—and all concern the same action—Plaintiff's placement on administrative duty. *Cf. Hardy v. Lewis Gale Med. Ctr., LLC*, 377 F. Supp. 3d 596, 612 (W.D. Va. 2019) ("While the specific allegations of discrimination in the Complaint may not be contained in each Plaintiff's EEOC charge, the allegations involve the same type of discrimination (race and/or national origin), the same source of discrimination (Booth and LGMC), the same department (Security), the same time period of discriminatory conduct, and

17

the same foundational facts."). Claims for RPD discrimination on the basis of national origin or color relating to Plaintiff's placement on administrative duty, generally, have been exhausted and are properly before this Court.

However, claims based upon facts separate from Plaintiff's placement on administrative duty, including his transfer from the ISU and work assignments at the JIU, are not properly before this Court. They are not mentioned in the text of the charge and an administrative investigation into the charge's contents would not reveal such facts. One case from within this District is a close analogue. In *Herr v. Am. Kennel Club*, "the administrative charge focuse[d] on only one event: [the plaintiff's] termination," but "the Amended Complaint s[ought] to recover for a variety of allegedly discriminatory conduct including his demotion; a decrease in pay, benefits, and bonuses; fabricating performance issues; giving unwarranted negative performance evaluations; other unspecified adverse employment actions; and creation of a hostile work environment." *Herr v. Am. Kennel Club*, No. 5:17-CV-00547, 2018 WL 5291857, at *4 (E.D.N.C. Aug. 23, 2018), *report and recommendation adopted*, No. 5:17-CV-00547-BR, 2018 WL 4565386 (E.D.N.C. Sept. 24, 2018). The court found that "[t]hese are not the types of closely connected issues that the Fourth Circuit has found to be reasonably related or that a reasonable investigation would uncover." *Id.* (citing *Syndor*, 681 F.3d at 594); *see also Marge v. N.C. Detective Agency*, No. 5:18-CV-592-FL, 2019 WL 2078773, at *3 (E.D.N.C. May 9, 2019) (finding failure to exhaust plaintiff's claim that he was unlawfully discharged, where "his EEOC charge [only] describes transfer from one work site to another," and involved different characters on a different date "four and a half months prior"). Similarly, here, an investigation into Plaintiff's placement on administrative duty in August 2017 would not reveal

18

facts relating to Plaintiff's removal from the ISU and the distribution of work assignments at the JIU, which occurred in late 2016 and early 2017 and involved different actors.

Finally, although Plaintiff has only checked the box for national origin discrimination in EEOC Charge A, Plaintiff's claims for color discrimination are also properly before this Court. "[A] plaintiff's failure to check the boxes for 'race,' 'color,' or 'national origin,' does not, by itself, preclude his claims for discriminatory discharge, so long as the narrative of the charge alleges that form of discrimination in the complaint." *Scarborough v. Wachovia Bank Corp.*, No. 3:04CV249, 2006 WL 2828683, at *3 (W.D.N.C. Sept. 29, 2006) (citing *Chacko*, 429 F.3d at 509). Here, the body of EEOC Charge A alleges that Plaintiff has also been discriminated against because of his "color, Brown[.]" *Cf. Gray v. Walmart Stores, Inc.*, No. 7:10-CV-171-BR, 2011 WL 1831780, at *4 (E.D.N.C. May 12, 2011) ("If plaintiff thought that she had been subjected to age and national origin discrimination, she could have, and should have, said so in her charge." (citation omitted)).

In sum, the following claims have been exhausted by EEOC Charge A and are properly before this Court: (1) for national origin and color discrimination arising out of Plaintiff's placement on administrative duty by members of the RPD and IA, including, but not limited to, Major Riggsbee; and (2) for retaliation by Major Riggsbee for Plaintiff's complaints against her husband.

2. March 26, 2018, Charge of Discrimination (EEOC Charge B)

In contrast to the parties' disagreement over the scope of EEOC Charge A, the parties do not appear to dispute that EEOC Charge B exhausts a single claim for retaliation: that Plaintiff was suspended and terminated for filing EEOC Charge A. [DE-30 at 12, 22; DE-28 at 11 ("In his second charge, Plaintiff contends that his February 23, 2018 suspension with pay and Major

19

Riggsbee's March 22, 2018 termination notice for insubordination occurred in retaliation for filing his first EEOC charge.").] The text of EEOC Charge B alleges "I believe I have been retaliated against for filing EEOC Charge 433-2018-01162 [i.e. the first charge] . . . ." The Court agrees that EEOC Charge B exhausts Plaintiff's claim that he was suspended and terminated for filing EEOC Charge A.

IV.     Failure to State a Claim

The Court has addressed exhaustion and the proper scope of the Complaint, and three distinct claims remain: first, for national origin and color discrimination by members of the RPD and IA, including, but not limited to, Major Riggsbee, arising out of Plaintiff's placement on administrative duty [EEOC Charge A]; second, for retaliation by Major Riggsbee for Plaintiff's complaints against her husband a decade earlier [EEOC Charge A]; and third, for retaliation for filing EEOC Charge A [EEOC Charge B].

A.  Motion to Dismiss

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court shall "'accept as true all of the factual allegations contained in the complaint,' and 'draw all reasonable inferences in favor of the plaintiff.'" *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 192 (4th Cir. 2015) (citation omitted). To survive a motion to dismiss, a complaint must contain facts and law sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While a plaintiff is not charged with pleading facts sufficient to prove her case, as an evidentiary matter, in her complaint, a plaintiff *is* required to allege facts that support a claim for relief." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *see Iqbal*, 556 U.S. at 677-80. However, in making this determination, the Court need not rely on "labels,"

20

*Twombly*, 550 U.S. at 555, "nor need [] 'accept as true unwarranted inferences, unreasonable conclusions, or arguments," *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).

### B.  National Origin and Color Discrimination

"Although an employee need not prove a prime facie case of discrimination to survive a motion to dismiss, he must state a plausible right to relief." *Ofoche v. Apogee Med. Grp.*, 815 F. App'x 690, 692 (4th Cir. 2020) (citation omitted).  Plaintiff must "nevertheless plead facts sufficient to support a reasonable inference that an alleged adverse employment action was motivated by bias or discrimination." *Tonin v. Baltimore City Police Dep't*, No. CV DKC 19-0323, 2020 WL 3259083, at *8 (D. Md. June 16, 2020) (citation and internal quotation mark omitted).

Plaintiff alleges that he has been discriminated against on the basis of national origin and color by members of the RPD, including, but not limited to, Major Riggsbee, and placed on administrative duty.  Plaintiff's claim appears to revolve around the following allegations:  (1) Major Riggsbee's "discriminatory animus against him [that] began with her husband, Sgt. Floyd Riggsbee" [SAC ¶ 116]; (2) alleged disparate treatment from his Caucasian counterparts; and (3) alleged policy violations by the RPD that occurred during the investigation into his conduct. But, even accepting all the facts alleged in the Complaint as true, Plaintiff has not stated a claim of discrimination.

### 1.  Major Riggsbee and Sgt. Floyd Riggsbee

The only incident of possible overt discrimination alleged is that "[Plaintiff] and Sgt. Floyd Riggsbee," ten years before the events leading to his placement on administrative duty, "had numerous incidents all surrounding Floyd Riggsbee's harassment and bullying of the

21

minority members of [Squad C]." [SAC ¶ 103.] Plaintiff does not, however, allege that Floyd Riggsbee *exclusively* harassed and bullied minority members, and the Complaint leaves open the possibility that Sgt. Riggsbee was simply a disagreeable man and a poor supervisor.

Plaintiff asks the Court to infer that Major Riggsbee's decision in 2017 was somehow motivated by discriminatory animus that originated with her husband a decade earlier, in 2007 and 2008. [SAC ¶¶ 116 ("where the origins of the discriminatory animus against him began with her husband, Sgt. Floyd Riggsbee.").] This inference, absent more, is unwarranted. Plaintiff's allegations concerning Sgt. Riggsbee occurred over a decade before Plaintiff's placement on administrative duty, and Plaintiff has not alleged any direct evidence that Major Riggsbee herself (or anyone else at the RPD or in IA responsible for his placement on administrative duty) acted with discriminatory intent. *See Vega v. Wake Cty. Gov't*, No. 5:14-CV-00257-RN, 2015 WL 1433583, at *7 (E.D.N.C. Mar. 27, 2015) ("Vega does not allege that she made comments reflecting a discriminatory animus . . . . Even if Vega's supervisor harbored a personal dislike for him that made his job more difficult, '[a]n employer is not required to like his employees.'" (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir. 2000))).

### 2. Disparate Treatment

"Absent direct evidence" of discrimination, like here, a plaintiff must allege the following elements under the *McDonnell Douglas* burden-shifting framework to state a claim for disparate treatment: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Murphy v. Cty. of New Hanover*, No. 7:17-CV-229-FL, 2019 WL 95778, at *3 (E.D.N.C. Jan. 3, 2019) (citing *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom. Coleman v. Court of Appeals of Maryland*, 566 U.S. 30 (2012)); *see*

22

*also Murphy v. Fed. Reserve Bank of Richmond*, No. 3:19CV180, 2020 WL 365104, at *6 (E.D. Va. Jan. 22, 2020) ("Although a Title VII plaintiff need not plead facts that constitute a prima facie case, a plaintiff still bears the burden of alleging facts sufficient to state all the elements of her claim." (citations and internal quotation marks omitted)). Plaintiff has not adequately alleged the second or fourth elements.

i.      Satisfactory Job Performance

Plaintiff has not alleged the second element of a discrimination claim based upon disparate treatment claim, satisfactory job performance. Although Plaintiff alleges that he "had performed his job more than satisfactorily prior to his removal as a Detective" [SAC ¶ 144; *see also* SAC ¶ 9], the Complaint contradicts his assertion of satisfactory performance. The Complaint is filled with numerous admissions that Plaintiff's performance was not satisfactory, including that Plaintiff included the wrong dates on a supplement [SAC ¶¶ 56-57], that he filed five different CPS reports late [SAC ¶¶ 60-68], and that he violated the RPD's "found property" policy [SAC ¶¶ 80-87]. *See Anderson v. Waste Mgmt. of Wilmington*, No. 7:15-CV-14-FL, 2016 WL 1183114, at *6 (E.D.N.C. Mar. 28, 2016), *aff'd*, 669 F. App'x 678 (4th Cir. 2016) ("Here, plaintiff has failed to plead that his job performance was satisfactory beyond conclusory recitations that he performed his work in a 'professional and outstanding manner.' Indeed, plaintiff's allegation that he previously had been suspended—a disciplinary action that plaintiff does not appear to take issue with—tends to belie his assertion that his performance was either 'professional' or 'outstanding.'").

Plaintiff, however, does specifically allege that he was promoted to the rank of Detective in 2010 [SAC ¶ 8] and assigned to the ISU [SAC ¶ 10], but both allegations fall short of providing the requisite inference of satisfactory job performance during the time period in

23

question. The promotion occurred seven years before the alleged discrimination at issue and there is nothing to indicate initial selection for the ISU was a promotion or in any way based upon merit. The facts alleged, without more, do not provide a reasonable inference that Plaintiff's performance at the time of alleged discrimination was satisfactory. The Complaint contains only barebones allegations that Plaintiff's performance was satisfactory, which is insufficient. *See Murphy*, 2019 WL 95778, at *4 ("Here, plaintiff alleges that '[a]t all times relevant to this complaint, Plaintiff performed his job in a satisfactory manner.' However, the court rejects this assertion as a legal conclusion couched as a fact."); *Battle v. Ruby Tuesday, Inc.*, No. 4:19-CV-123-BR, 2020 WL 2513680, at *2 (E.D.N.C. May 15, 2020) (dismissing complaint where, *inter alia*, plaintiff "provides only conclusory statements regarding his purportedly satisfactory job performance.").

     ii.  Different Treatment from Similarly Situated Employees Outside the Protected Class

  Plaintiff also fails to allege that he was subject to different treatment from similarly situated employees outside his protected class. While "evidentiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons" are generally left for summary judgment, *Woods v. City of Greensboro*, 855 F.3d 639, 650-51 (4th Cir. 2017), a plaintiff must nevertheless "show that [he or] she is similar in all relevant respects to [his or her] comparator," *Martinez v. Constellis, LLC*, No. 3:19CV720, 2020 WL 4589194, at *4 (E.D. Va. Aug. 10, 2020) (citation and internal quotation marks omitted). "Employees are similarly situated where they dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of

them for it." *Martinez*, 2020 WL 4589194, at *4 (citations and internal quotation marks omitted).

Plaintiff lists several Caucasian RPD employees he asserts have committed more egregious policy violations and have received lesser discipline. [SAC ¶¶ 121-132.] Plaintiff alleges the following: one police officer used profanity in an argument with his supervisor and was insubordinate and was transferred [SAC ¶¶ 121-123]; another police officer was arrested for being impaired at an airport and for illegally attempting to carry a weapon onto his flight, and he was allowed to retire early with full benefits [SAC ¶¶ 124-126]; another officer was involved in an extramarital sexual relationship with a female trainee, and he was demoted but not terminated [SAC ¶¶ 127-128]; and two other officers were involved in a public, physical altercation where a weapon was drawn and neither was terminated [SAC ¶¶ 129-132]. But, these incidents— involving inappropriate amorous relationships, substance abuse, or fits of temper, almost entirely outside of the work context itself—differ from what is alleged here, where Defendant had repeated and self-admitted performance issues and was placed on administrative duty pending investigation. Plaintiff has also not alleged that the same decisionmakers, including Major Riggsbee, were involved in the disciplinary decisions, and Plaintiff has alleged the individuals involved were police officers, not higher-ranking Detectives, which Plaintiff was. *Cf. Martinez*, 2020 WL 4589194, at *4-5 (finding inadequate comparators where Plaintiff was terminated after he was involved in a car accident which Defendants determined he was at fault for and Plaintiff alleged other individuals who were involved in car accidents were treated differently, but did not allege "that Defendants determined that these individuals were at fault for their car accidents" nor "that these [] individuals held positions similar to [Plaintiff's] position"); *see also Coleman*, 626 F.3d at 191 (holding comparator not similarly situated where plaintiff was allegedly

disciplined for steering contracts to vendors in which he had an interest and comparator had unspecified "outside business involvements" and was his supervisor); *cf. Mason v. Sun Recycling, LLC*, No. GLS-18-2060, 2020 WL 1151046, at \*10-11 (D. Md. Mar. 9, 2020) (finding comparator was similarly situated, although "a close call," where comparator was involved in the same rock-throwing incident that the plaintiff was terminated for). In sum, the comparators are not sufficiently similarly situated to provide any plausible inference of discrimination.

### 3. Alleged Policy Violations

Finally, none of the alleged policy violations provide an inference of discriminatory intent. Plaintiff lists several alleged RPD policy violations, which he states support a claim of discrimination: that the IA investigation took more than thirty (30) days [SAC ¶ 99]; that Plaintiff's communications with Sgt. Stranahan were not transcribed and provided to him [SAC ¶ 93]; that Sgt. Latour did not interview Plaintiff [SAC ¶ 46]; that Plaintiff was not informed he was under investigation for the child abuse case [SAC ¶ 96]; and that the phones in Plaintiff's desk were searched [SAC ¶¶ 88-89, 91]. However, most of these alleged violations are directly contradicted by allegations in the Complaint and none provide an inference that Plaintiff was treated differently because of his national origin or color.

First, Plaintiff alleges that the IA investigation took more than thirty (30) days, but, as alleged, IA continued to uncover new problems with Plaintiff's work performance—that he included the wrong dates on a supplement [SAC ¶¶ 56-57], that he filed five different CPS reports late [SAC ¶¶ 60-68], and that he violated the RPD's "found property" policy [SAC ¶¶ 80-87], all of which Plaintiff admits. Moreover, Plaintiff provides his own neutral basis for the continued investigation: "Upon information and belief, coupled with Det. Rios' general

26

experience in the RPD, if an officer was cleared of an Internal Affairs investigation, then, that officer would be targeted again as Internal Affairs would find something else to accuse the officer of." [SAC ¶ 59.] Further, the simple fact that Plaintiff did not receive transcripts of his conversations with Sgt. Stranahan—absent allegations that the content of the conversations was somehow improper—does not provide the requisite inference of discrimination.

Next, Plaintiff alleges that "a typical investigation of a complaint would be commenced by interview of the officer's immediate supervisor" [SAC ¶ 46] and that Plaintiff was interviewed by Lt. Desimone, not Sgt. Latour [SAC ¶ 44]. Plaintiff also alleges that he should have been, but was not, "informed that he was under investigation about the child abuse case." [SAC ¶ 96.] The second allegation—that Plaintiff was not informed he was under investigation—is inconsistent with the first, wherein Plaintiff alleges the investigation commenced through the interview with Lt. Desimone where they discussed the CPS complaint. [SAC ¶ 45 ("Lt. Desimone advised Det. Rios that a complaint had been filed against him by Jennifer Woody and Kizzy Thomas, citing 'poor police service'.").] Further, Plaintiff alleges that the CPS employees filed the complaint against him [SAC ¶ 45] not because of any discriminatory bias, but because one CPS employee did not "like being called out for a mistake she made by the Asst. District Attorney" [SAC ¶ 48].

Finally, Plaintiff alleges that the RPD searched the phones found in his desk [SAC ¶ 89], but he does not actually allege the search violated any RPD policy; to the contrary, the Complaint states that "there is no departmental policy that covers the search of personal belongings, even if on department property" [SAC ¶ 91]. In sum, none of the conduct alleged could provide an inference of discrimination.

27

C. Retaliation

Next, the Court address Plaintiff's retaliation claims. Plaintiff has two claims for retaliation: first, that he was placed on administrative duty on August 7, 2017, for the complaints filed by Plaintiff against Major Riggsbee's husband between 2007 and 2008; and second, that he was placed on suspension and terminated for filing his first EEOC charge. In order to state a claim for retaliation, a Plaintiff must allege that: "(1) he engaged in protected activity; (2) his employer took an action against him that a reasonable employee would find materially adverse; and, (3) a causal connection between the protected activity and the adverse employment action." *Brown v. Goodwill Indus. of E. N. Carolina, Inc.*, 361 F. Supp. 3d 558, 562 (E.D.N.C. 2019) (citations omitted).

1.  August 7, 2017, Placement on Administrative Duty

Plaintiff fails to state the third element of his first retaliation claim. Although alleging "causation at the pleading stage is 'not an onerous burden,'" a plaintiff must nevertheless "allege facts plausibly supporting an inference of causation." *Pouncey v. Guilford Cty.*, No. 1:18CV1022, 2020 WL 1274264, at *13 (M.D.N.C. Mar. 17, 2020) (citations omitted). "If too long a period of time passes between the protected activity and the retaliatory conduct, 'courts may look to the intervening period for other evidence of retaliatory animus.'" *Id.* (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Courts have held that sixteen-month gaps, *id.*, at *14, eleven-month gaps, *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1204 (10th Cir. 2008), and thirteen-month gaps, *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 646 (9th Cir. 2003), are, without more, too long to support an inference of causation. Here, more than a decade—or 120 months—passed between Plaintiff's complaints against Sgt. Floyd Riggsbee and Plaintiff's placement on administrative duty; Plaintiff, therefore, must provide some other facts

28

to infer causation. Plaintiff has not done so. To the contrary, Plaintiff alleges no issues with Major Riggsbee or IA and no investigations in the intervening decade. Major Riggsbee is married to Sgt. Riggsbee, but given the amount of time that has passed, that link alone is insufficient to allege causation.

### 2. Suspension and Termination

Plaintiff has adequately alleged all three elements of his second retaliation claim—that he was terminated for filing EEOC Charge A. First, Plaintiff's filing of EEOC Charge A constitutes a protected activity. *See Jefferies v. UNC Reg'l Physicians Pediatrics*, 320 F. Supp. 3d 757, 761 (M.D.N.C. 2018) ("her filing of the June 19, 2017 EEOC charge did constitute a protected activity." (citation omitted)). Second, although Plaintiff's placement on suspension with pay pending investigation does not appear to qualify as an adverse employment action, *see Lewis v. Richland Cty. Recreation Comm'n*, No. 3:16-CV-2884-MGL-TER, 2018 WL 4957407, at *7 n.3 (D.S.C. July 30, 2018) ("[A] number of courts addressing Title VII retaliation claims have concluded that a suspension with pay pending a prompt investigation into allegations of wrongdoing does not constitute an adverse employment action." (citations and internal quotation marks omitted), *report and recommendation adopted*, No. CV 3:16-2884-MGL-TER, 2018 WL 4214373 (D.S.C. Sept. 5, 2018), Plaintiff's termination surely does, *see Scarborough*, 2006 WL 2828683, at *4.

Defendant and Plaintiff mainly contest whether Plaintiff has alleged causation. Defendant raises two primary arguments. First, Defendant argues that Plaintiff's claim of retaliation must fail because, based upon emails it attaches to its motion to dismiss, the RPD began questioning Plaintiff about the December 2016 missing case file that ultimately led to his firing on January 30, 2018 [DE-14-9], one day *before* Plaintiff filed EEOC Charge A [DE-28 at

29

20 ("It is impossible to claim that an investigation that began prior to the January 31, 2018 EEO charge is in retaliation for the filing of that charge.")].  However, the adverse employment action at issue is not the investigation into the December 2016 incident, but is instead Defendant's ultimate decision to fire Plaintiff, which occurred after Plaintiff filed EEOC Charge A.  Second, Defendant argues that an alternative explanation for Plaintiff's termination, based upon its own exhibits, exists:  Plaintiff previously violated several work policies and refused to answer questions in the final administrative investigation relating to the 2016 case.  [*See* DE-27 at 1 (incorporating five declarations); *see* DE-31 at 8-10; *see also* SAC ¶ 134 ("Det. Rios is terminated for alleged insubordination for allegedly refusing to participate in an investigation.").]

Under certain circumstances, including those present here, temporal proximity alone may suffice to allege causation.  *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012) ("temporal proximity between the protected activity and the employer's adverse action alone will suffice" (citations omitted)).  "'[A] causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity.'" *Lowman v. Maryland Aviation Admin.*, No. CV JKB-18-1146, 2019 WL 133267, at *8 (D. Md. Jan. 8, 2019) (citing *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017)).  Recently, the Fourth Circuit observed that "although we have not drawn a bright temporal line, we have observed that two-and-a-half months between the protected activity and the adverse action" is too long to create the requisite inference of causation, but that just "one month" did create a jury question regarding causation.  *Wilcox v. Lyons*, --- F.3d ---, No. 19-1005, 2020 WL 4664794, at *3 (4th Cir. Aug. 11, 2020) (citations omitted).

Here, Plaintiff filed EEOC Charge A on January 31, 2018, Plaintiff was placed on suspension on February 23, 2018 [see EEOC Charge B], and Plaintiff received notice of his

30

termination in March 2018 [SAC ¶ 136; EEOC Charge B ("March 22, 2018")]. Even assuming Defendant was informed that Plaintiff had filed EEOC Charge A on the earliest possible date, January 31, 2018—the date it was filed [*but see* SAC ¶ 117 ("RPD was informed . . . in late January *and/or early February 2018*")]—based on the facts alleged, less than two full months had passed between the filing of Plaintiff's charge and his termination in March. This two-month length falls in between the lengths recognized in *Wilcox*, and courts in the Fourth Circuit have found two months sufficiently close to state the causation element of a Title VII retaliation claim. *See Lowman*, 2019 WL 133267, at *8 ("Two months, on the other hand, is sufficiently short." (citations omitted)); *Cox v. U.S. Postal Serv. Fed. Credit Union*, No. GJH-14-3702, 2015 WL 3795926, at *4 (D. Md. June 17, 2015) ("Viewing the facts in the light most favorable to Cox, the Court finds that the temporal proximity between the February meeting and the April termination are close enough in time and circumstance to establish a causal connection."); *Wilkes v. Argueta*, No. 1:16CV260, 2017 WL 1215749, at *5 (M.D.N.C. Mar. 31, 2017) ("Courts have found very close temporal proximity where two months or less lapsed between the alleged protected activity and the adverse employment action." (citations omitted)); *cf. Hines v. Blue Cross & Blue Shield of N. Carolina*, No. 1:19-CV-754, 2020 WL 3452155, at *4 (M.D.N.C. June 24, 2020) (finding, in the FMLA retaliation context, "[t]he Court has previously held that a plaintiff satisfies the third element of a retaliation claim by alleging a gap of approximately two months between the end of her FMLA leave and her termination. The Court holds the same here." (citation omitted)); *cf. Virginia Transformer Corp. v. Ebbert*, No. 7:18-CV-00143, 2019 WL 1415467, at *5 (W.D. Va. Mar. 28, 2019) (finding, in Section 1981 retaliation context, temporal proximity of two months alone was sufficient to satisfy pleading burden). Based on temporal proximity alone, Plaintiff has alleged a retaliation claim for filing EEOC Charge A.

31

Although an inference of causation based upon temporal proximity can be undermined where there is an alternative explanation for the alleged retaliation conduct on the face of the Complaint, see *Blakney v. N. Carolina A&T State Univ.*, No. 1:17CV874, 2019 WL 1284006, at *22 (M.D.N.C. Mar. 20, 2019) (dismissing Title VII claim even where temporal proximity existed based on plaintiff's own allegations), the Court declines to credit Defendant's assertions, based upon documents beyond the Complaint itself, at this stage. Further, although Defendant asserts "Plaintiff admits that he 'refus[ed] to answer any more questions about *de minim[i]s* administrative matters that comparable officers did not have to endure'" [DE-31 at 8 (citing DE-30 at 22)], the Complaint instead alleges that "[d]uring the course of all the IA 'investigations', [Plaintiff] willingly answered any and all questions posed to him, truthfully, and based upon his recollection of the events" [SAC ¶ 118; *see also* SAC ¶ 134 ("[Plaintiff] is terminated for *alleged* insubordination for *allegedly* refusing to participate in an investigation." (emphasis added))]. "Of course, discovery may ultimately reveal evidence that causes the Court to view this temporal proximity differently. But for now, [Plaintiff] has met h[is] minimal pleading burden." *Cox*, 2015 WL 3795926, at *4.

V.    Conclusion

For the foregoing reasons, Defendant's Motion [DE-27] is GRANTED IN PART and DENIED IN PART. Only Plaintiff's retaliation claim that he was terminated for filing EEOC Charge A remains.

SO ORDERED, this the ___18th___ day of September, 2020.


RICHARD E. MYERS II
UNITED STATES DISTRICT JUDGE

32